**Kathleen FLAKE, et al., Plaintiffs,**

v.

**William J. BENNETT, et al., Defendants.**

**Civ. A. No. 84–3632.**

United States District Court, District of Columbia.

March 28, 1985.

Latham, Watkins & Hills, Irwin Goldbloom, Reed E. Hundt, Peter L. Winik, Arne M. Sorenson, Washington, D.C., for plaintiffs; Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Union

Fund of Nat. Capital Area, Washington, D.C., of counsel.

Richard K. Willard, Acting Asst. Atty. Gen., Joseph diGenova, U.S. Atty., Judith F. Ledbetter, Alan L. Ferber, Dept. of Justice, Washington, D.C., for defendants; Roxanne Ando, Dept. of Educ., and Elizabeth Corey, Office of Personnel Management, Washington, D.C., of counsel.

## MEMORANDUM

OBERDORFER, District Judge.

On March 22, 1985, this action came before the Court for a hearing on the parties' cross motions for summary judgment. Plaintiffs Kathleen Flake ·and William A. Delaney are GS–13 trial attorneys in the Office for Civil Rights ("OCR") of the Department of Education ("Department"). In April or May of 1984, both plaintiffs applied for promotion to the position of Senior Trial Attorney, GS–14–905. According to the official OCR job description for that position, a Senior Trial Attorney is responsible for "advising the Assistant Secretary for Civil Rights on complaint investigations, compliance reviews and negotiations prior to formal enforcement proceedings, the legal review of cases prior to findings of noncompliance and the assessment and disposition of appeals, filed by complainant appellants from findings and determinations reached in the Regional offices." Exhibit B to Flake Affidavit (February 14, 1985). He or she is also "expected to work in conjunction with lawyers from the Department of Justice, in the litigation of trials and appeals (primarily in federal courts), [and] in pertinent cases in which the Department is a party, or has an interest." *Id.* The occupant of the position must also "have an authoritative knowledge of the civil rights laws, related case law, and rules and regulations administered by the Office for Civil Rights." *Id.* The job description makes no mention of any activity or responsibility involved with the protection of the United States from internal subversion or foreign aggression.

Nevertheless, the position has been designated "critical-sensitive" pursuant to the Department's personnel security program. As a result, the Department refused to process the plaintiffs' applications in the absence of completed Standard Form 86 and ancillary forms, which would have subjected plaintiffs to a full field security investigation.

At approximately the same time that plaintiffs filed their applications, Mary VonEuler applied for promotion to Senior Trial Attorney. On September 6, 1984, after being told that the position had been designated "critical-sensitive," she submitted the required forms and consented to a full investigation. She was promoted to GS–14 on October 22, 1984.

Although several other GS–14 and GS–15 employees in OCR are "critical-sensitive" employees, only VonEuler and the plaintiffs were asked to submit to a full field investigation as a condition of promotion. The plaintiffs view the full investigation requirement as an unwarranted invasion of privacy and as a violation of equal protection principles. They also contend, at the threshold, that the Department's designation of the GS–14 position as "critical-sensitive" is inconsistent with the Supreme Court's interpretation of the Act of August 26, 1950, 64 Stat. 476, 477, and Executive Order 10450, which provide the basis for security designations like the one at issue here. In support of the latter proposition, the plaintiffs cite *Cole v. Young*, 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956), in which the Supreme Court held that neither the Act nor the Executive Order applied to the position of an employee whose work did not involve the national security.

This suit was filed on November 30, 1984. On January 6, 1984 the defendant Office of Personnel Management published a revision of, among other things, the portions of the Federal Personnel Manual (FPM) that govern personnel security programs under the Executive Order. Sometime during February of 1984, the Department began to consider how to reevaluate its personnel .security program in light of the FPM revision. The Department has

now decided to solicit a consultant to review and recommend revisions to the personnel security program.

The Department has determined that it will not make a final decision on its security designations until the outside consultant makes its recommendations. During the hearing on the pending cross-motions for summary judgment, counsel for the defendants represented that the consultant's evaluation may not be completed for over a year. The Department represents that, pending the completion of this independent evaluation, it will not impose its personnel security requirements on the plaintiffs. According to affidavits submitted by the defendants on the eve of the hearing in this case, plaintiffs' applications have been processed and the plaintiffs promoted, effective retroactive to October 22, 1984. Affidavit of John C. Yazurlo (March 18, 1985) at ¶ 8; Affidavit of Peggy B. Holly (March 18, 1985). At the March 22 hearing, however, counsel revealed that plaintiffs had not yet been informed of their promotions, and that Standard Form 50, which officially documents personnel action, had not yet been prepared.

## I.

█ The defendants argue that this case is moot because the plaintiffs have obtained all of the relief that they requested in their complaint. However, the plaintiffs sought, among other things,

> a declaratory judgment that the national security clearance requirement imposed by defendants on plaintiffs is unlawful, unconstitutional, and therefore invalid and that plaintiffs' applications for promotion should be considered and processed as of the date plaintiffs submitted their requests for promotion.

Complaint, Prayer for Relief, ¶ 3. Flake avers that her application was complete but that the Department quit processing it when it was received by the Office of the Inspector General's Security Officer on August 1, 1984. Flake Affidavit (March 13, 1985) at ¶ 4. Delaney states that the Security Officer received his application on August 23, 1984. Delaney Affidavit (March 20, 1985) at ¶ 3. These statements are supported by a Memorandum from Helene Deramond to Antonio J. Califa dated August 30, 1984. *See* attachment to Flake Affidavit (March 13, 1985). It appears that but for the challenged security investigation requirement, the plaintiffs' applications were complete and they would have been promoted in August, two months before the October 22 retroactive date determined by the defendants.[1] Thus, there is a live controversy because the plaintiffs have not received the relief to which they claim they are entitled, *i.e.*, that their applications be "considered and processed *as of the date plaintiffs submitted their requests for promotion*" (emphasis added).

█ Moreover, there is another sense in which the plaintiffs have not yet received the relief that they have requested. At the hearing on the pending motions, counsel for defendants conceded that the forms that would make plaintiffs' promotions official have not yet been produced. A purported promotion is without effect in the absence of proper supporting documentation. *See Wilson v. United States*, No. 324–81C, slip op. 2 (Ct.Cl.1981) ("a Government employee is entitled only to the rights and salary of the position to which he has actually been appointed by one having the authority to do so"). Accordingly, there is at this point still a controversy as to whether or not the plaintiffs must be promoted.

In any event, a live controversy remains because the defendants have not conceded

---

**1.** The inference that the October 22 date was arbitrarily selected by the Department is supported by the fact that it is the effective promotion date for VonEuler and the two plaintiffs, even though each of them applied on different dates and even though the plaintiffs' applications were received by the Security Officer *before* VonEuler's. Moreover, defendants concede that the plaintiffs' supervisory recommendations had been approved by mid-August, and that it was at that point that the required Standard Forms 52 ("Request for Personnel Action") were transmitted to the Department's Office of Inspector General for review under the personnel security program. Yazurlo Affidavit (March 18, 1985) at ¶ 3.

what the plaintiffs asked the Court to declare—that the challenged security program is unlawful. The mere voluntary cessation of the security program pending its reevaluation does not moot this dispute.

The security review requirement affects both applicants and holders of the Senior Trial Attorney position. Thus, the fact that plaintiffs have been promoted does not mean that they will be immune from security review should the Department choose to enforce the program once again. Moreover, the defendants have conceded that "it is possible that upon completion of the Department's reevaluation, plaintiffs' positions may be designated critical-sensitive with the recurrence of the challenged personnel security procedures...." Memorandum of Points and Authorities in Support of Defendants' Cross Motion for Summary Judgment at 11. The decision to seek the opinion of a consultant cannot be properly characterized as a "cessation" at all—the defendants have expressly and impliedly reserved the right to enforce the challenged security program as they see fit, and have not formally rescinded it by rulemaking or otherwise.

Indeed, the Department's past behavior—about which there appears to be no dispute—highlights the risk that the defendants will quickly return to their "old ways"[2] if the Court does not issue a decision on the merits. In the Spring of 1983, Assistant Secretary for Civil Rights Harry M. Singleton notified the senior staff of OCR that the Department had determined that security investigations would be required for OCR Series 905 attorneys, whose positions had been designated "critical-sensitive." Virtually all of the OCR's staff signed a petition that stated, among other things, that "[b]ecause we cannot perceive any link between our jobs and national security, and because none has been explained, we are reluctant to participate in a process that will involve a substantial invasion of our privacy." Flake Affidavit (February 14, 1985), Exhibit M. In the face of this reaction and the unfavorable press about the dispute, the Department's Inspector General elected to delay the implementation of the personnel security program in the OCR. Singleton later informed his staff that no more security forms should be submitted because the Inspector General had decided to reconsider the sensitivity of the OCR positions. Flake Affidavit (February 14, 1985), Exhibit O. The security investigation requirement was not imposed again until, without prior notice, the plaintiffs were informed that their applications would not be approved unless they completed forms consenting to a full security investigation. It is apparent, therefore, that the Department's promise to reconsider its program does not necessarily mean that the challenged action will be stopped.

Under the circumstances, the Supreme Court's admonition in *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), is particularly appropriate:

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.... The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.

*Id.* at 632, 73 S.Ct. at 897 (citations and footnote omitted). Given the defendants' concession that the challenged practice could be reimposed on the plaintiffs, and the Department's past behavior, it is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Ass'n.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). Accordingly, there is still a "live" controversy in this case.

---

**2.** *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

Nevertheless, the defendants argue that the controversy is not yet ripe for adjudication because the reevaluation of the Department's security program may yield something quite different from what the plaintiff's are challenging. This claim appears to be no more than a variation on defendants' mootness argument and is answerable in the same way: a practice is not *less* likely to recur because the defendants promise to reconsider the program, rather than to abolish it altogether.

■ In determining whether an agency's decision is ripe for adjudication, courts must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). An issue is fit for decision under the first prong of the *Abbott* test if it is "essentially legal" and "sufficiently final." *Atlantic Richfield Co. v. United States Department of Energy*, 769 F.2d 771, 782–83 (D.C.Cir. 1984). Here, there is a concrete question susceptible to judicial review: whether or not the Department of Education may lawfully impose a security investigation requirement on applicants for a position that does not implicate national security concerns. That decision is final in the sense that voluntary cessation does not prevent the defendants from reimposing what had been, until very recently, a fully formed agency determination. Indeed, ripeness is not even an issue insofar as the challenged program prevented the plaintiffs from being promoted before October 22, 1984, and to the extent that plaintiffs have not yet been officially promoted. As to the second prong of the *Abbott* test, an immediate decision will reduce the potential hardship on all parties to the litigation. The defendants will be in a better position to judge the necessity and scope of the review that they propose to undertake, and the plaintiffs will not be put to the cost of reinstituting this suit in the event that the defendants decide to continue with the security pro-

gram. For these reasons, the controversy is ripe for decision.

## II.

As a second threshold defense, defendants argue that *Carducci v. Regan*, 714 F.2d 171 (D.C.Cir.1983), deprives the Court of subject matter jurisdiction over this action. *Carducci* addressed the narrow question of whether an agency personnel action which was not an alleged violation of constitutional rights, but which had been directly reviewable by district courts under the Administrative Procedure Act before enactment of the Civil Service Reform Act of 1978 (CSRA), continues to be reviewable after enactment of the CSRA. The Court held that a "minor personnel action," which by definition does not rise to the level of an "adverse action" or a "prohibited personnel practice," was not reviewable under the CSRA. *Id.* at 175. Defendants argue that the Department has taken no "adverse action" against the plaintiffs and has not indulged in "prohibited personnel practices." Accordingly, the defendants conclude that the actions at issue here are not reviewable under the CSRA, and therefore are not reviewable at all.

■ But the action challenged in this case is not an unreviewable "minor personnel action" that applies to one individual; rather, the plaintiffs attack a regulatory program with broad application. The principles enunciated in *Carducci* simply do not apply to cases like this one. In *National Treasury Employees Union v. Devine*, 733 F.2d 114 (D.C.Cir.1984), which involved a challenge to personnel regulations, our Court of Appeals rejected a similar CSRA defense with these words:

It is one thing to say that when a statute provides a detailed scheme of administrative protection for defined employment rights, less significant employment rights of the same sort are implicitly excluded and cannot form the basis for the relief directly through the courts. *Cf. Carducci [,supra].* It is quite different to suggest ... that a detailed scheme of administrative adjudication impliedly

precludes preenforcement judicial review of rules.

*Id.* at 117 n. 8.

■ In any event, *Carducci* recognizes district court jurisdiction to consider constitutional challenges like the one at issue here. 714 F.2d at 175–76; *see also Andrade v. Lauer*, 729 F.2d 1475, 1491 (D.C. Cir.1984). Since the plaintiffs have raised first amendment, right to privacy, and equal protection issues, their action is not limited to the remedy provided by the CSRA.[3]

### III.

The defendants have not responded to the plaintiffs' argument on the merits. The essential facts are undisputed.

The current personnel security program originated in the Act of August 26, 1950 ("Act"), 64 Stat. 476, 477 *codified in part at* 5 U.S.C. §§ 3571, 7531 & 7532. The Act delegated to certain listed officials and agencies[4] the authority to suspend, without pay, civilian departmental employees "when deemed necessary in the interest of national security." Section 3 of the Act provided that "[t]he provisions of this Act shall apply to such other departments and agencies of the Government as the President may, from time to time, deem necessary in the best interests of national security." *See also* 5 U.S.C. § 7531(9).

Pursuant to section 3, President Eisenhower issued Executive Order 10450, which extends the Act "to all other departments and agencies of the Government." Executive Order 10450, § 1, 18 Fed. Reg. 2489, *as amended by* Executive Order No. 10491, 18 Fed.Reg. 6583 (Oct. 16, 1953); *see also Cole, supra,* 76 S.Ct. at 874–77. The Order also requires each Department and agency

to establish a personnel security program. Pursuant to section 3(b) of the Order and subsequent modifications, a position is to be designated "critical-sensitive" and therefore subject to a full field investigation if its occupant "could bring about, by virtue of the nature of the position, a material adverse effect on the national security...." Employees seeking a "noncritical-sensitive" position are required to undergo a less intrusive "national agency check," an investigation to which the plaintiffs do not object.

OPM is responsible for determining whether departments and agencies are complying with Executive Order 10450. It also provides advice as to whether a position should be designated "critical-sensitive," "noncritical-sensitive," or "nonsensitive." Pursuant to the Order, OPM's predecessor, the Civil Service Commission, prepared a Federal Personnel Manual which details the personnel security program. Although that manual has been superseded, it provided the basis for the challenged designations in this case. It defines "security" as being

> concerned with the employment and retention in employment of persons in positions the duties of which relate to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, and subversion, and any and all other acts or situations likely to weaken or destroy the United States.

Federal Personnel Manual 732–3 at 1–1 (1979); *see also* Federal Personnel Manual 732–3 at 1–1 (1984) (identical definition). Department of Education Directive A:INS:1–100, which was issued by the De-

---

**3.** Defendants' argument that plaintiffs lack standing to raise these constitutional issues is meritless. Even assuming the dubious proposition that plaintiffs have not alleged a sufficiently specific injury to their first amendment rights, the defendants do not even pretend to respond to plaintiffs' right to privacy and equal protection claims. This case is thus clearly outside the limit that *Carducci* imposes on this Court's subject matter jurisdiction.

**4.** Specifically, the Attorney General, the secretaries of the Departments of State, Commerce, Defense, the Army, the Navy, the Air Force, the Coast Guard, and the Treasury, the Atomic Energy Commission, the chairman of the National Security Resources Board, and the director of the National Advisory Committee for Aeronautics.

partment after it consulted with OPM about developing a personnel security program, lists five criteria to be considered in deciding whether or not to designate a position "critical-sensitive."[5] The fifth criterion, which provides the basis for the "critical-sensitive" designation of the GS–14 Senior Trial Attorney position at issue here, see Answer at ¶ 27, asks only whether the position involves "[f]iduciary, public contact, or other duties demanding the highest degree of public trust." Directive A:INS:1–100 at 7 (Flake Affidavit (February 14, 1985), Exhibit G).

■ Reliance on such a sweeping criterion is misplaced. The Act and Executive Order 10450, as interpreted by the Supreme Court in *Cole v. Young,* 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956), prevent the defendants from requiring full security investigations for positions that do not affect the national security of the United States. In *Cole,* a food and drug inspector of what was then the Department of Health, Education and Welfare was dismissed from his job "in the interest of the national security," purportedly under the authority of the Act and Order. The Supreme Court held the dismissal unlawful, and found that neither the Act nor Executive Order 10450 applied to the position of the employee who had been dismissed. The Court reasoned that the Act was intended to permit summary employee discharges only in the interest of national security and concluded that the position from which the employee had been dismissed did not implicate national security concerns. The Court observed that while the term "national security"

is not defined in the Act, we think it clear from the statute as a whole that that term was intended to comprehend only those activities of the Government that are directly concerned with the protection of the nation from foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare.

351 U.S. at 544, 76 S.Ct. at 867. The Court added that the scope of the Executive Order was similarly limited, because the defense and security-oriented nature of the agencies named in the Act "indicates the character of the determination required to effect … an extension" under section 3 of the Act. *Id.* at 545, 76 S.Ct. at 867. Moreover, the Order was promulgated to implement the Act, *id.* at 557 n. 20, 76 S.Ct. at 873 n. 20, and its reach cannot extend beyond the Act's scope.

■ The defendants do not dispute the fact that the GS–14 Senior Trial Attorney position sought by the plaintiffs does not implicate national security concerns.[6] *Cole* teaches that it is unlawful for the defendants to designate such a position as "critical-sensitive," and thus to impose upon applicants for or occupants of that position the burden of undergoing a full field investigation. Just as the Act's summary discharge procedure could not be used against the plaintiff in *Cole,* whose job did not involve the national security, here the full investigation requirement cannot lawfully be imposed on a position the duties of which do not implicate the concerns identified in the Act and the Executive Order.

Because the Court concludes that neither the Act nor Executive Order 10450 permits

---

5. These criteria are also listed in both the old and new Federal Personnel Manuals. *See* Federal Personnel Manual 732–3 at 2–3 (1984); Federal Personnel Manual 732–3 at 1–3 (1979).

6. The plaintiffs support this proposition with affidavits that are not controverted by the defendants. *See* Flake Affidavit (February 14, 1985) at ¶ 6; Delaney Affidavit (February 14, 1985) at ¶ 6. A review of the position description of an OCR GS–14–905 Senior Trial Attorney confirms the accuracy of the assertions in the affidavits that the responsibility of the position

is "to assist in the effort to fully monitor and enforce the civil rights laws relating to education" and that "[t]here are no responsibilities of these positions which involve protection of the United States from internal subversion or foreign aggression." Flake Affidavit (February 14, 1984) at ¶ 6; *see id.,* Exhibit B. The affidavits also support the proposition that the plaintiffs do not have custody of documents or materials "the compromise of which might endanger the country's security." *Cole, supra,* 351 U.S. at 544, 76 S.Ct. at 867.

**78**

the defendants to impose such an intrusive requirement on the position for which the plaintiffs have applied, it is not necessary to reach the constitutional issues that the plaintiffs raise. *See New York City Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). An accompanying order will enter judgment for the plaintiffs.

### ORDER

A hearing was held in this case on March 22, 1985. Upon consideration of plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment, the oppositions thereto, and the arguments of counsel, and for the reasons set forth in an accompanying memorandum, it is this 29th day of March, 1985, hereby

ORDERED: that plaintiffs' motion for summary judgment be, and is hereby, GRANTED; and it is further

ORDERED: that defendants' cross-motion for summary judgment be, and is hereby, DENIED; and it is further

ORDERED, ADJUDGED and DECREED: that defendants are enjoined to promote plaintiffs to the GS–14 positions to which plaintiffs have applied, such promotions to be retroactive in every respect to August 1, 1984 for plaintiff Flake, and August 23, 1984 for plaintiff Delaney; and it is further

ORDERED, ADJUDGED and DECLARED: that the GS–14 senior trial attorney position to which plaintiffs have applied and to which they have herewith been promoted may not lawfully be characterized as "critical-sensitive" within the meaning of Executive Order 10450 and Chapter 732 of the Federal Personnel Manual, and thus subject to a full security investigation.